# AFFIDAVIT

I, Jonathan Wilson, Special Agent, Homeland Security Investigations ("HSI"), being duly sworn, declare and state as follows:

## I. PURPOSE OF AFFIDAVIT

1. This affidavit is also made in support of an application for a warrant to search one Samsung digital device, model number SM-G996B, used by Jose Antonio Arroyo Ortuno ("ARROYO"), hereinafter the "SUBJECT DEVICE," in the custody of Homeland Security Investigations in Knoxville, Tennessee, as described more fully in Attachment A.

2. The requested search warrant seeks authorization to seize evidence, fruits, or instrumentalities of violations of 21 U.S.C. § 841(a)(1) (possession with intent to distribute controlled substances), 21 U.S.C. § 846 (conspiracy and attempt to distribute controlled substances) 21 U.S.C. §§ 959, 963 (conspiracy to import controlled substances into the United States), and 18 U.S.C. § 1956 (Money Laundering) (the "Subject Offenses"), as described more fully in Attachment B. Attachments A and B are incorporated herein by reference.

3. The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested search warrant and does not purport to set forth all my knowledge of or investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II. BACKGROUND OF AFFIANT

4. I am an investigative or law enforcement officer of the United States or of a State within the meaning of Title 18, United States Code, Section 2510(7), in that I am empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in Title 18, United

States Code, Section 2516. I am cross designated and have the authority to conduct Title 21 investigations and enforcement activities. I have been involved with investigations for Title 21 offense and am familiar with the Interagency Cooperation Agreement between the Drug Enforcement Administration (DEA) and ICE dated June 18, 2009.

5. I am a Special Agent with Homeland Security Investigations (HSI) and have been since March 2020. In March 2021, I successfully completed both the Criminal Investigator Training Program (CITP) and HSI Special Agent Training (HSISAT) at the Federal Law Enforcement Training Center. From 2017 until 2020, I was employed as a Detective with the Clinton, TN Police Department. From 2011 until 2017, I was employed as a police officer with the Oak Ridge, Tennessee Police Department. During my time in local law enforcement, I was also assigned to the 7th Judicial District Violent Crime and Drug Task Force in Anderson County, TN. In 2012 I attended and completed the Basic Police School at the Tennessee Law Enforcement Training Academy in Donelson, TN. In 2011 I earned my B.S. Degree in Criminal Justice from Middle Tennessee State University (MTSU) in Murfreesboro, TN. Through my training, my experience, and my discussions with other law enforcement officers, I am familiar with drug trafficking, drug trafficking organization methods, prison gangs, cooperating witnesses, and confidential sources. I have received training and have experience related to Federal Criminal Procedures, federal statutes, and U.S. Customs Regulations. I have also received training and instruction in the investigation of drug trafficking offenses. I have participated in numerous investigations related to drug trafficking. I have participated in numerous search warrants executed by HSI, as well as state and local police departments, and have participated in numerous seizures of computer systems and other evidence containing communications concerning drug trafficking offenses. As a result of my training and experience, as well as conversations with other

knowledgeable federal law enforcement agents, I am familiar with drug trafficking cartels in Mexico, how they operate, their leadership structure, their use of communication methods, their laundering of drug trafficking proceeds, among other information about cartels.

### III. STATEMENT OF PROBABLE CAUSE

6. Based on my review of law enforcement reports, conversations with other law enforcement agents, and my own knowledge of the investigation, I am aware of the following:

#### A. LAW ENFORCEMENT SEIZES A LARGE AMOUNT OF METHAMPHETAMINE

7. In December of 2019, law enforcement seized approximately 500 grams of methamphetamine in the Eastern District of Tennessee. That seizure led to a federal investigation into the source of the drugs. Through numerous federal search warrants, four rounds of federal wiretaps, surveillance, and other investigative methods, law enforcement learned that Eladio Mendoza ("MENDOZA") was leading a group of individuals distributing a massive amount of methamphetamine in the Southeastern United States.

8. Law enforcement observed that one particular house visited by MENDOZA appeared to be a possible stash house for methamphetamine imported from Mexico. The address of the house was 917 Pleasant Hill Road, Conyers, Georgia, hereinafter the "STASH HOUSE." On or about March 9, 2020, federal law enforcement executed a federal search warrant on the STASH HOUSE and other locations in Georgia. There was a house, a bus, and a tractor-trailer (18-wheeler truck) on the STASH HOUSE property. The bus and the tractor-trailer truck had crossed into the United States, from Mexico, approximately 4-5 days earlier.

3

9. In the house, law enforcement discovered equipment that had been used to convert methamphetamine from liquid into crystal form. In the bus, law enforcement found approximately 17 kilograms of crystal methamphetamine hidden inside. Inside the tractor-trailer, law enforcement found approximately 841 kilograms of methamphetamine hidden, in neatly stack rows, beneath the floor of the trailer. Below is a photograph of methamphetamine hidden beneath the trailer floor.



10. In MENDOZA's home, law enforcement discovered another approximately 69 kilograms of methamphetamine, approximately $180,000 in cash, and multiple cell phones previously used by MENDOZA.

11. One of the cell phones contained WhatsApp messages between MENDOZA and telephone number +52-443-109-7944 ("ARROYO PHONE"), believed to be used by ARROYO.

### B. ARROYO AND MENDOZA DISCUSS SHIPMENTS OF METHAMPHETAMINE FROM MEXICO INTO THE UNITED STATES

12. For example, on or about February 19, 2020, ARROYO, using the ARROYO PHONE, had the following conversation, in part, with MENDOZA as follows:[1]

ARROYO: Buddy, they are going, going to call you on my behalf. Hand them the little key so some people can stay around there and um, I'm here with my buddy talking , bud- we are

---

[1] This conversation was translated from Spanish into English by a fluent speaker of both languages.

4

also going to put in- in case the car gets delayed even more, we'll send a small truck with about sixty (60) so you can be ready, god willing.

MENDOZA: Yeah, buddy. As matter of fact, there's, there's, a guy there so the house won't look deserted, I put one of my guys in there, he sleeps there, he goes there every day and spends the night there-he's going to be there and in his house, and I go every eight (8) days to eat there so it won't look so deserted. But yeah, the house is ready, buddy. And I'll hand over the keys to whomever you tell me too.

13. Based on my training and experience, as well as the context of this conversation within the investigation, I believe that during this conversation, ARROYO asked MENDOZA to make sure that a stash house was ready to receive a large shipment of methamphetamine ("Hand them the little key[s] so some people can stay around there") because ARROYO was sending a truck loaded with 60 or 600 kilograms of methamphetamine in a small truck in case the car they are also sending gets delayed ("in case the car gets delayed even more, we'll send a small truck with about sixty, so you can be ready"). MENDOZA responded that the house was ready ("there's a guy there so the house won't look deserted") and that he was ready to hand over the keys to the house to ARROYO's men whenever he was asked ("I'll hand over the keys to whomever you tell me too.").

14. On or about February 21, 2020, ARROYO, using the ARROYO PHONE had the following conversation, with MENDOZA, in part, as follows:[2]

ARROYO: No, no, no, you be cautions; when you [see/feel] something bad, leave. Um, alright, we're at the line, as I told you, everything is good. I'm just waiting on them to let me know about the jumped but they told me we would jump this weekend, buddy, with the food, so you can be there. Anyways, I told my buddy, the one who gave you the pieces, so you could be doing something in the meanwhile. You know that job benefits you in either way, right?

15. Based on my training and experience, as well as the context within this investigation, I believe that during this conversation, ARROYO told MENDOZA that he had a

---

[2] This conversation was translated from Spanish into English by a fluent speaker of both languages.

5

shipment of methamphetamine at the border ready to cross the border ("We're at the line, as I told you, everything is good."). ARROYO told MENDOZA that he expected the methamphetamine to cross the border into the United States over the weekend and asked MENDOZA to be ready ("we would jump this weekend, buddy, with the food, so you can be there.")

16. On or about February 22, 2020, ARROYO, using the ARROYO PHONE, asked MENDOZA to send money to four separate names, Beatriz Galvan Cruz, Deanix Galvan Cruz, Jose Antonio Arroyo Ortuno, and Marilu Arroyo Ortuno. Beatriz Galvan Cruz, according to visa application records, is married to ARROYO.

17. On or about February 25, 2020, ARROYO, using the ARROYO PHONE, told MENDOZA that the money to his wife, Beatriz Galvan Cruz, had not gone through yet, and to check on the payment. According to ARROYO's visa application, his wife is Beatriz Galvan Cruz. According to border records, ARROYO has also crossed into the United States with Beatriz Galvan Cruz on numerous occasions, and both list the same home address on a visa application. As such, I believe that the user of the ARROYO PHONE was ARROYO.

18. On or about March 4, 2020, or approximately 5 days before a large amount of methamphetamine was seized at the STASH HOUSE run by MENDOZA, ARROYO, using the ARROYO PHONE sent a message to MENDOZA indicating that a large amount of methamphetamine was headed his way in a truck stating "It's going to get good soon, um, the trailer is on that side of the [Ria or Tia]. It's going to be a fucking good hit. My buddy was given the permits and everything already, that's why we wanted to send out this truck so you wouldn't be without doing something."[3] Based on my training and experience, as well as the context within this investigation, I believe that during this conversation, ARROYO told MENDOZA that he had

---

[3] This conversation was translated from Spanish into English by a fluent speaker of both languages.

6

a large amount of methamphetamine that just crossed into the United States ("It's going to get good soon, the trailer is on that side of the [Ria or Tia]."). ARROYO indicated that it would be a large load ("It's going to be a fucking good hit.").

19. We know from border crossing records that on or about March 4, 2020, a truck and bus, later found at the STASH HOUSE to contain large amounts of methamphetamine, crossed the border from Mexico into the United States.

20. On or about March 6, 2020, approximately three days before the seizure at the STASH HOUSE of hundreds of kilograms of methamphetamine, ARROYO using the ARROYO PHONE messaged MENDOZA asking for an address to tell the truck where to go. MENDOZA responded with a Google street view photograph with the address for the STASH HOUSE, 917 Pleasant Hill Road.

21. After law enforcement seized large amounts of methamphetamine at the STASH HOUSE on or about March 9, 2020, MENDOZA fled the United States to Mexico, based on cell phone and Facebook geo-location records that placed him near the border and then inside Mexico. MENDOZA returned the same general area of Mexico where ARROYO lives, according to ARROYO's visa application.

22. According to records obtained by law enforcement, the ARROYO PHONE was dropped, or ceased activity, sometime shortly after the seizure on March 9, 2020. Based on communication records obtained by law enforcement, I believe that ARROYO acquired another phone number, or another series of phone numbers, to continue his large-scale methamphetamine distribution.

23. On or about December 5, 2021, ARROYO crossed into the United States from Mexico through McAllen, Texas. His wife Beatriz Galvan Cruz was with him, along with his

children. He was arrested on his indictment in the Eastern District of Tennessee on drug trafficking offenses. In his possession was the SUBJECT DEVICE. The SUBJECT DEVICE is a black Samsung smartphone, Model Number SM-G996B. ARROYO listened to several of the audio messages detailed above to MENDOZA when played by his interviewers. ARROYO admitted that the voice in the recording was his. ARROYO denied that he was a large-scale drug trafficker and claimed that he was a simple avocado farmer/distributer sending avocados to MENDOZA and others. He could not or would not explain why the bus and tractor trailer that crossed the border from Mexico and arrived at the STASH HOUSE run by MENDOZA did not contain any avocados but rather hundreds of kilograms of methamphetamine.

## IV. TRAINING AND EXPERIENCE ON DRUG OFFENSES

24. Based on my training and experience and familiarity with investigations into drug trafficking conducted by other law enforcement agents, I know the following:

   a. Drug trafficking is a business that involves numerous co-conspirators, from lower-level dealers to higher-level suppliers, as well as associates to process, package, and deliver the drugs and launder the drug proceeds. Drug traffickers often travel by car, bus, train, or airplane, both domestically and to foreign countries, in connection with their illegal activities, to meet with co-conspirators, conduct drug transactions, and transport drugs or drug proceeds.

   b. Drug traffickers often maintain books, receipts, notes, ledgers, bank records, and other records relating to the manufacture, transportation, ordering, sale, and distribution of illegal drugs. The aforementioned records are often maintained where the drug trafficker has ready access to them, such as on their cell phones and other digital devices. This includes the laundering of drug proceeds, depositing of drug proceeds, managing accounts, and managing the family's expenses. In the modern day, these financial activities are frequently done using a phone.

8

c. Communications between people buying and selling drugs take place by telephone calls and messages, such as e-mail, text messages, and social media messaging applications, sent to and from cell phones and other digital devices. This includes sending photos or videos of the drugs between the seller and the buyer, the negotiation of price, and discussion of whether participants will bring weapons to a deal. In addition, it is common for people engaged in drug trafficking to have photos and videos on their cell phones of drugs they or others working with them possess, as they frequently send these photos to each other and others to boast about the drugs or facilitate drug sales. I am also aware that at least some of this type of information is frequently shared with spouses of drug traffickers, to facilitate travel, explain absences, coordinate wire transfers, coordinate the receipts of drug proceeds, and to coordinate family expenditures.

d. Drug traffickers often keep the names, addresses, and telephone numbers of their drug trafficking associates on their digital devices. Drug traffickers often keep records of meetings with associates, customers, and suppliers on their digital devices, including in the form of calendar entries and location data.

e. I am aware the drug traffickers in Mexico commonly use WhatsApp to communicate because of its perceived protections from law enforcement surveillance. Drug traffickers frequently send audio clip messages, photographs, videos, and text messages using WhatsApp. While WhatsApp messages are encrypted, they can be stored in a viewable format on a device that has sent or received the messages for an indefinite period. Audio of ARROYO's voice would constitute admissible evidence in this investigation into ARROYO's drug trafficking and money laundering activities.

f. I am aware that drug traffickers and others take photographs that document their families, their associates, their trade, their travels, their lifestyles, their homes, and their

9

property. This evidence can be powerful evidence of involvement in a conspiracy, evidence of unexplained wealth, and/or evidence of travel to cartel related meetings.

g. Based on all the available evidence in this case, and my training and experience, I believe that ARROYO is a significant player in a transnational criminal organization ("TCO")/cartel operating out of Michoacan, Mexico. Based on my conversations with other law enforcement officers and officials, I am aware that the flow of methamphetamine from Michoacan has continued unabated since March of 2020, and has involved the shipment of thousands of kilograms of methamphetamine from Mexico into the United States. For example, a few months after law enforcement seized methamphetamine from the tractor-trailer at the STASH HOUSE, that same tractor-trailer attempted to cross into the United States again, and was discovered by law enforcement personnel to contain another large load of methamphetamine hidden in the same manner as the methamphetamine seized from the tractor-trailer at the STASH HOUSE. As such, I strongly believe that ARROYO continues to distribute large amounts of methamphetamine.

h. Based on my training and experience, as well as the seizures of other devices from TCO members and their family members, I am aware that seized electronic devices from TCO members can yield a wealth of evidence of their membership in TCOs/cartels, their role in those organizations, their contacts, their associates, their methods of operations, their identities, their unexplained wealth, their operating areas, their communications, their movement of cash proceeds from drug sales, their knowledge about their activities, their motives for their activities, and their knowledge that the illegal narcotics, including methamphetamine, are destined for the United States.

**TRAINING AND EXPERIENCE ON DIGITAL DEVICES**

25. As used herein, the term "digital device" includes the SUBJECT DEVICE.

26. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

    a. Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet. Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time. Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

    b. Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device. That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them. For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

    c. The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it. For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

d.      Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions. Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

27.     Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data in a short period of time for a number of reasons, including the following:

a.      Digital data are particularly vulnerable to inadvertent or intentional modification or destruction. Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.

b.      Digital devices capable of storing multiple gigabytes are now commonplace. As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

c.      Reviewing the SUBJECT DEVICE may take some time. For example, some types of WhatsApp messages are not easily examined through commonly used forensic examination software. Moreover, it is expected that most, if not all content on the phone will be in Spanish, which will need to be translated into English for a proper review of the contents of the phone. Moreover, there may be a risk that at least some of the communications on the phone may be privileged (marital privilege), and as such, a careful review of the contents of the phone will be required to segregate out any privileged communications.

## CONCLUSION

28. For all of the reasons described above, there is probable cause that the items to be seized described in Attachment B will be found in a search of the SUBJECT DEVICE described in Attachment A.

29. Furthermore, because this warrant involves the search of a device in the government's possession, the government seeks the ability to search the device at any given time of day.

_____
JONATHAN WILSON, Special Agent
HSI

Subscribed to and sworn before me
this 14TH day of December, 2021.

_____
H. BRUCE GUYTON
UNITED STATES MAGISTRATE JUDGE

# ATTACHMENT A

## PROPERTY TO BE SEARCHED

1. The black Samsung electronic device, Model Number SM-G996B, (the "SUBJECT DEVICE"), pictured below, seized on or about December 5, 2021, in McAllen, Texas, from ARROYO, and currently maintained in the custody of Homeland Security Investigations in a secure law enforcement facility in Knoxville, TN.

i



## ATTACHMENT B

## I. ITEMS TO BE SEIZED

1. The items to be seized are evidence, contraband, fruits, or instrumentalities of violations of 21 U.S.C. § 841(a)(1) (possession with intent to distribute controlled substances), 21 U.S.C. § 846 (conspiracy and attempt to distribute controlled substances), 21 U.S.C. §§ 959, 963 (conspiracy to import illegal narcotics into the United States), and 18 U.S.C. § 1956 (Money Laundering and Money Laundering Conspiracy) (the "Subject Offenses"), and apply to all sections below, namely:

    a. Records, documents, programs, applications and materials, or evidence of the absence of same, sufficient to show call log information, contact lists, including all telephone numbers dialed from any of the digital devices and all telephone numbers accessed through any push-to-talk functions, as well as all received or missed incoming calls, related to the above named violations, unexplained wealth, and/or including the identification of ARROYO, his associates, or the activities of their co-conspirators;

    b. Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show SMS text, email communications or other text or written communications sent to or received from any of the digital devices and which relate to the above-named violations, unexplained wealth, and/or including the identification of ARROYO, hisassociates, or the activities of their co-conspirators;

    c. Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show instant and social media messages (such as Facebook, Facebook Messenger, Snapchat, FaceTime, Skype, and WhatsApp), SMS text, email communications, or other text or written communications sent to or received from any digital device and which relate to the above-named violations, unexplained wealth, and/or including the identification of ARROYO, his associates, or the activities of their co-conspirators;

    d. Records, documents, programs, applications, materials, or conversations relating to the trafficking of drugs, and unexplained wealth, including ledgers, pay/owe records,

i

distribution or customer lists, correspondence, receipts, records, and documents noting price, quantities, and/or times when drugs were bought, sold, or otherwise distributed, money laundering, the above-named violations, unexplained wealth, and/or including the identification of ARROYO, his associates, or the activities of their co-conspirators;

  e. Audio recordings, pictures, video recordings, or still captured images related to the purchase, sale, transportation, or distribution of drugs, money laundering, the above-named violations, unexplained wealth, and/or including the identification of ARROYO, his associates, or the activities of their co-conspirators;

  f. Contents of any calendar or date book;

  g. Global Positioning System ("GPS") coordinates and other information or records identifying travel routes, destinations, origination points, and other locations; and

  h. With respect to the SUBJECT DEVICE containing evidence falling within the scope of the foregoing categories of items to be seized:

    i. evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, e-mail, e-mail contacts, chat and instant messaging logs, photographs, videos, location information, and correspondence;

    ii. evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

    iii. evidence of the attachment of other devices;

    iv. evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

    v. evidence of the times the device was used;

vi. passwords, encryption keys, and other access devices that may be necessary to access the device;

vii. applications, utility programs, compilers, interpreters, or other software, as well as documentation and manuals, that may be necessary to access the device or to conduct a forensic examination of it;

viii. records of or information about Internet Protocol addresses used by the device;

ix. records of or information about the device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

2. As used herein, the terms "records," "documents," "programs," "applications," and "materials" include records, documents, programs, applications, and materials created, modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.